**In re the Commitment of T.A., Appellant–Respondent,**

v.

**WISHARD HEALTH SERVICE, MIDTOWN COMMUNITY MENTAL HEALTH CENTER, Appellee–Petitioner.**

No. 49A02–1011–MH–1243.

Court of Appeals of Indiana.

June 17, 2011.

Deborah Markisohn, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Robin Bandy, Deputy Counsel, Wishard Health Services, Indianapolis, IN, Attorney for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

T.A. was admitted to Wishard Health Services, Midtown Community Mental Health Center ("Wishard") after she removed her clothing in public. T.A.'s attending physician diagnosed her with bipolar disorder and concluded that she was in a manic state. Wishard sought and obtained a temporary commitment of T.A. on the basis that she is mentally ill and gravely disabled. T.A. appeals, contending that there is insufficient evidence that she is gravely disabled. There is evidence to support the doctor's conclusion that T.A. does not have a realistic plan to care for herself, which the trial court could credit over T.A.'s claims to the contrary. Therefore, we affirm.

### Facts and Procedural History

On October 25, 2010, T.A. was admitted to Wishard after she had removed her clothes in public in downtown Indianapolis. That same day, Wishard filed an application for emergency detention of T.A. The application alleged that T.A. was in a state of mania, that she was impulsive and disoriented, that her thought process was confused, that she was unable to make

logical choices, and that she had poor insight into her condition.

On October 28, 2010, Wishard filed a report indicating that T.A. had been diagnosed with bipolar disorder. Her attending physician, Dr. Michael DeMotte, stated that T.A. was "illogical and unable to convey reality based plans for self care." Appellant's App. at 13. T.A. had refused treatment, and Dr. DeMotte requested a temporary commitment.[1]

A hearing was held on November 1, 2010. Dr. DeMotte testified that he had examined T.A. on a daily basis (excluding weekends) since October 26. Dr. DeMotte stated that he had diagnosed T.A. with bipolar disorder and that she was having a manic episode. He gave the following explanation of his diagnosis:

> Primarily a change in mood state to an expansive mood for a period of greater than over than [sic] a week duration and/or requiring hospitalization, as well as other associated symptoms, including decrease in need for sleep. She describes her sleep as tormented. Increased energy, she says she's so energetic to do abundance.
>
> Increase in [im]pulsivity. This relates to the circumstances of [T.A.'s] immediate detention, bringing her to the hospital. She acknowledges that she took her clothes off in the street downtown to prove that she could take it to Hollywood and that a queen doesn't live in . . . the hood and has continued to state that she has this ability and right to express herself in that fashion in regards to illegal consequences or any risks it might pose to herself.
>
> Also, increased role directed activities and behaviors. She's acknowledged a

variety of different plans for schooling but is unable to recite how she can make her basic needs, what she'll do for food or shelter.

> Also have concerns with her judgment. She expressed earlier during the course of hospitalizations that she had children that she needed to care for. She could not give us identity or location of those children, resulting in a report to Child Protective Services. As of Friday, I could better determine by her interview that at one time, though, that it appears that those children are in Illinois with family. . . .

Tr. at 11–12.

Dr. DeMotte testified that T.A. would not "forthrightly and consistently" provide answers about her medical history, including whether she had previously taken drugs for mental illness and whether she had ever been hospitalized or committed because of mental illness. *Id.* at 10. However, she would sometimes make comments like, "I'm not doing that again," or "I'm not taking that medicine again." *Id.* Dr. DeMotte had prescribed Risperdal, but T.A. refused to take it. He discussed alternatives to Risperdal with her, but she would not agree to take anything.

Dr. DeMotte opined that T.A. was gravely disabled because her "symptoms are impacting her thought process and her judgment and precluding her from safe decision making, as well as meeting her basic needs with food, shelter and clothing." *Id.* at 13. In his interviews with T.A., she had not identified any housing options. She discussed the possibility of attending several different schools, but was not enrolled at any of them. She claimed to have worked as a nurse's aide in Illinois before she moved to Indianapo-

---

**1.** A temporary commitment is one that does not exceed ninety days. Ind.Code § 12–26–6–

1.

lis, but was unemployed at the time of the hearing. She stated that she had received welfare benefits in Illinois. T.A. had not allowed Wishard to contact any friends or family members, so Dr. DeMotte was unaware of anyone who would be able to assist T.A. in meeting her basic needs.

Dr. DeMotte's plan for T.A.'s treatment included medication and inpatient stabilization, which he thought would take seven to nine days. After that, he thought that T.A. could transition to outpatient status with treatment planning to assist her in meeting her basic needs. Dr. DeMotte felt that a commitment was in her best interest because T.A. lacked the necessary insight to "assist in the treatment and monitoring for her symptoms." *Id.* at 14. Dr. DeMotte opined that the benefits of the medication he prescribed would outweigh any side effects.

T.A. testified that she had lived in Illinois most of her life and had moved to Indianapolis about three months before the hearing. She stated that she had been attending Parkland College in Illinois, but had not maintained the required grade point average, so she came to Indianapolis to attend Ivy Tech, where she planned to take prerequisite courses for health administration. She had intended to start at Ivy Tech that fall, but she was unable to supply the school with certain information that was needed before the classes filled up. Therefore, she planned to begin in January and was searching for employment in the meantime.

At another point during the hearing, T.A. stated that she came to Indianapolis because her lease in Illinois had ended, and she also stated that she "came to the town through a shelter." *Id.* at 25. When she first moved to Indianapolis, she had her two youngest children with her, and they were living in a shelter. At some point, T.A. went back to Illinois to try to get custody of her oldest son. When she returned to Indianapolis, the shelter was full, and she had no place to live. T.A. testified that her two youngest children were "temporar[ily] remov[ed]" at that point. *Id.* at 39. They were living in foster care at the time of the hearing. Her oldest son was living with his aunt in Illinois, but T.A. did not know where the aunt lived. T.A. appeared to depend on her mother for information about her oldest son.

As to her employment history, T.A. stated that she has had a Certified Nursing Assistant ("CNA") license since 2005. When her attorney asked her how long she had worked as a CNA, T.A. stated that she had been "very active as a CNA since 2005," but she did not mention any specific place where she had worked. *Id.* at 24. Her most recent job was housekeeping for a hotel.

T.A. acknowledged being flustered the day that she was admitted. She had been living with a male friend who "was kind of getting pushy on the strength, like it was startin' to get a little awkward, maybe because I'm a girl and he's a guy and maybe he has emotions." *Id.* at 28. Therefore, T.A. decided to leave. At some points during the hearing, she stated that she had taken her belongings with her, but at other times she said she left them at the place that she had been staying.

After she left, T.A. got lost and also lost her bus pass, so she started walking around and applying for jobs at stores and restaurants. She claimed that the police kept following her and harassing her throughout the day. That was when she decided to take her clothes off in public, an action that she described as an "ego-statistical piss fit type of gesture." *Id.* at 33. T.A. explained her reason for undressing as follows: "I outwardly acted out to them and I outwardly just told them like, okay,

if you guys are going to keep harassing me with this, how about you just go ahead and strip me down and then you can call me crazy, but I'm not crazy. . . ." *Id.* at 34. She also stated that she thought her actions might make her famous and "get [her] some . . . roof and a place . . . faster or whatever." *Id.* at 33.

T.A. testified that she did not agree with Dr. DeMotte's diagnosis and that she did not want to take medication because she did not feel that she had a problem. She asserted that Dr. DeMotte had not seen her "demonstrate any kind of outward irrational thinking," *id.* at 35, and that he "doesn't have a real logical reason to snatch that kind of power out of my hands and stipulate me to medication." *Id.* at 43.

T.A. believed that she was about to start receiving benefits under the Temporary Aid to Needy Families program ("TANF"). She planned to use that money to rent an apartment, and in the meantime, she would stay at a shelter. She was aware that Horizon House gives out food to homeless people, and she claimed to be well versed in the resources available in Indianapolis. When she was asked whether she could get TANF benefits without having her children live with her, she stated, "as far as I'm concerned, I do have children and they are . . . in my jurisdiction." *Id.* at 31.

At the conclusion of the hearing, the trial court found that T.A. was suffering from bipolar mania and is gravely disabled. The court therefore ordered a temporary commitment of T.A. T.A. now appeals the court's ruling.

### Discussion and Decision

■ At the outset, T.A. acknowledges that her commitment expired on January 30, 2011. Although the issues in this case are moot, "a moot case may be decided on its merits when it involves questions of great public interest that are likely to re-

cur." *In re Commitment of Steinberg,* 821 N.E.2d 385, 387 n. 2 (Ind.Ct.App.2004). T.A. notes that we have previously found that the "question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society," *id.,* and Wishard does not argue that this case should be dismissed. Therefore, we will address the issues raised by T.A.

■ To demonstrate that a person should be committed involuntarily, a petitioner must show "by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind.Code § 12–26–2–5(e). At the hearing, T.A. disagreed with Dr. DeMotte's diagnosis and denied having a mental illness; however, on appeal, she does not argue that there was insufficient evidence that she is mentally ill. Wishard did not claim that T.A. was dangerous, but relied solely on evidence that she was gravely disabled.

■ T.A. argues that there is insufficient evidence that she is gravely disabled. When reviewing the sufficiency of the evidence in commitment cases, we consider only the evidence and reasonable inferences therefrom most favorable to the trial court's judgment. *In re Commitment of K.F.,* 909 N.E.2d 1063, 1066 (Ind.Ct.App. 2009). We do not reweigh the evidence or judge the credibility of witnesses. *Id.* "If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible." *In re Commitment of M.M.,* 826 N.E.2d 90, 96 (Ind.Ct.App.2005), *trans. denied.*

Indiana Code Section 12–7–2–96 defines "gravely disabled" as

a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

(1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

We conclude that there is sufficient evidence that T.A. has a substantial impairment of her judgment and reasoning rendering her unable to function independently.[2] Dr. DeMotte testified that T.A. had been unable to explain to him how she would meet her basic needs, and the evidence as a whole supports a conclusion that her view of her ability to care for herself is unrealistic. At the hearing, T.A. testified that she was going to receive TANF and use that money to rent an apartment. While we do not purport to make a final conclusion about her eligibility for TANF, we note that her own testimony indicates that it is highly unlikely that she is eligible. T.A. acknowledged that none of her children were currently in her care. Two were in foster care in Indiana and the third was living in Illinois with his father's sister. *See* 470 IAC 10.3–3–7 (children in foster care are not eligible for TANF); 470 IAC 10.3–3–10 (children who are not Indiana residents are not eligible for TANF). When questioned about her eligibility, she stated, "as far as I'm concerned, I do have children and they are . . . in my jurisdiction." Tr. at 31. Yet she acknowledged that her two youngest children had been removed. She was unable to state whether there was a pending Child in Need of Services case, and in general, she appeared to have little information about her children.

As alternatives to renting an apartment, T.A. testified that she could go to a shelter or go back to her last residence. However, her own testimony indicates that, whether through her own fault or not, she cannot always find a place in a shelter when she needs it. T.A. left her last residence because the man with whom she had been living was "getting pushy on the strength." *Id.* at 28. T.A. also seemed confused as to whether she had left her belongings at this man's house or whether she had been carrying them with her when she left.

T.A. asserts that she demonstrated that she is employable. The only evidence of her employment history is her own testimony that she had worked for a hotel at some point while she was living in Illinois. When asked about her employment as a CNA, she would only state that she had been "very active as a CNA since 2005," even though her attorney attempted to prompt her to give a more specific answer. *Id.* at 24. She was not employed at the time of the hearing. T.A. testified that she was planning to take courses at Ivy Tech beginning in January 2011. However, Dr. DeMotte testified that this was just one of many plans she had mentioned, none of which accounted for how she would provide for herself.

T.A. characterizes her choices as merely unwise or idiosyncratic. However, Dr. DeMotte explained how her thoughts and actions were consistent with bipolar mania

---

**2.** Because Indiana Code Section 12–7–2–96 is written in the disjunctive and we find sufficient evidence that T.A. is unable to function independently, we will not address whether she is unable to meet her essential needs. *See* *In re Commitment of A.L.,* 934 N.E.2d 755, 762 n. 2 (Ind.Ct.App.2010) (noting that the petitioner needs to prove only one prong of the definition of "gravely disabled"), *trans. denied.*

and gave examples of irrational thinking. In particular, Dr. DeMotte testified that T.A. had insisted that she had the right to take her clothes off in public and seemed unable to appreciate the possible consequences of that sort of behavior. Her own explanation of her behavior was illogical.

T.A. compares her case to *In re Commitment of K.F.*, where K.F. exhibited some unusual behaviors, but we ultimately concluded that there was insufficient evidence that she was unable to function independently. 909 N.E.2d at 1067. In that case, there was conflicting testimony from K.F.'s relatives as to whether she could function independently, and her doctor's testimony on that point was equivocal. At any rate, K.F. had a husband who was able to care for her and support her. By contrast, T.A. has not been willing to enlist the help of family or friends.

T.A.'s case is more similar to *In re Commitment of A.L.*, 934 N.E.2d 755 (Ind. Ct.App.2010), *trans. denied.* We affirmed A.L.'s commitment, which was based on a finding that she was gravely disabled. *Id.* at 762. As evidence of her inability to function independently, we noted that A.L. did not have a home of her own, had moved from place to place after getting into arguments with her hosts, had not been able to obtain gainful employment, and did not have custody of her children. A.L. emphasized her own testimony that she had an apartment available for her use at the time of the hearing, that she had applied for Medicaid and food stamps, and that she had always been able to care for her basic needs despite some odd behaviors and ideations. We rejected A.L.'s argument as a request to reweigh the evidence. *Id.*

The record reflects that T.A. may have some general awareness of benefits and resources that might be available. However, there is also evidence that would support an inference that her plans for her care are not realistic due to impaired reasoning. Like A.L., T.A. has moved from place to place, was not employed, and did not have custody of her children. T.A.'s own testimony suggests that she has an unrealistic view of her ability to obtain benefits, housing, custody of her children, or employment, and the trial court was not required to credit her claims. Therefore, we conclude that there is sufficient evidence to support the trial court's finding that T.A. is gravely disabled, and we affirm the order of commitment.

Affirmed.

NAJAM, J., and ROBB, C.J., concur.