**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public
Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**PHYLLIS J. GARRISON**
Wishard Health Services
Indianapolis, Indiana



FILED

Aug 30 2012, 9:23 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMMITMENT OF D.W., | ) | |
| | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No.  49A02-1201-MH-13 |
| | ) | |
| WISHARD HEALTH SERVICES MIDTOWN MENTAL HEALTH, | ) | |
| | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gerald S. Zore, Judge
Cause No. 49D08-1112-MH-45975

**August 30, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-respondent D.W. appeals his temporary involuntary commitment to a mental health facility of appellee-petitioner, Wishard Health Services (Wishard). Specifically, D.W. contends that the evidence was insufficient to support the trial court's findings that he was mentally ill and gravely disabled. Finding sufficient evidence, we affirm.

FACTS

On or about November 22, 2011, D.W. was admitted to Wishard as a prisoner of Marion County after he was detained by police for erratic behavior. Specifically, D.W. drove a Jeep up the steps of the Indiana War Memorial in downtown Indianapolis and set a fire at the top. D.W. had wrapped an American flag around him and was wearing gold-painted boots and carrying a cross and a staff at the time of the incident. He also had a loaded weapon with him. Upon his admission to Wishard, D.W. explained his behavior by stating he had received "a sign from God to act on his message." Tr. p. 9.

On December 2, 2011, Dr. Stephanie Price of Midtown Community Mental Health Center, which is a part of Wishard, filed a petition for involuntary commitment in the Marion Superior Court, asking the court for a temporary commitment of D.W. for a period of ninety days. In the petition and the attached physician's statement, Dr. Price alleged that D.W. suffers from a psychiatric disorder, namely Bipolar Disorder, Manic Episode, "which substantially disturbs [D.W.'s] thinking, feelings, or behavior, and impairs [D.W.'s] ability to function." Appellant's App. p. 15. Dr. Price claimed that D.W. should be temporarily committed on the basis of dangerousness in that he presents

2

a substantial risk of harm to others and on the basis that D.W. is gravely disabled as a result of his mental condition.

On December 12, 2011, the trial court held an evidentiary hearing on the petition for D.W.'s temporary involuntary commitment. Dr. Price testified that she is a resident physician who is training in psychology under the supervision of Dr. Michael DeMotte. D.W. stipulated to Dr. Price's expertise as a psychiatrist insofar as she is a licensed physician in Indiana. Dr. Price then testified that in the nearly three weeks since D.W.'s admission, she had examined D.W. on a "week day [sic] basis, except for Thanksgiving, Thursday and Friday, and that weekend." Tr. p. 6.

On the basis of Dr. Price's examinations of D.W. and of the records relating to his treatment, Dr. Price concluded that D.W. suffers from "Bi Polar Disorder, Maniac [sic] Episode with Psychotic Features." Id. at 7. Dr. Price stated that D.W. also "meet[s] some criteria that are consistent with Post Traumatic Stress Disorder, and Narcissistic Personality Disorder, but it's difficult to make that diagnosis in the midst of a maniac [sic] episode, so we would not like to make those at this time." Id. Dr. Price explained that the following symptoms exhibited by D.W. supported the diagnosis of bipolar disorder:

> So, for greater than a week period he's shown a persistent change in mood, more expansive.[1] It could also be elevated[2] or irritable. Uh, during that

---

[1] An expansive mood is "characterized by unceasing and indiscriminate enthusiasm for interpersonal, sexual, or occupational interactions." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 328 (4th ed. 1994).

[2] A person experiencing an elevated mood feels "euphoric, unusually good, cheerful, or high." Id.

3

time he's shown decrease[d need] for sleep, sleeping about, average two hours on the unit per night, prior to that, no more than four. Um, signs of grandiosity, saying that he's received messages from God, and acting on those messages. He's also shown distractibility. Continuing having conversations, and not remembering, or recollecting that he shared the discussions, and going off on multiple tangents during the discussions. Um, he's showed a flight of ideas, or racing thoughts. He's also shown hallucinations. He's admitted to those. Um, those are some of the criteria that we look for.

Tr. p. 7-8.

When asked whether she believed that, as a result of his mental illness, D.W. was gravely disabled, Dr. Price responded affirmatively. She explained by stating that D.W. continued to justify his actions at the War Memorial as "an attempt to bring us all to Christ, and that he [had] received a message from God to take his cross there, and let it be known . . . that he was going to rule the world, or God was going to rule the world, and bring everyone back to him." Id. at 8. Dr. Price stated that D.W. "acted on those [beliefs] in poor judgment." Id. In addition, she stated that D.W. admitted to having hallucinations. However, at the hearing D.W. interjected, stating, "They're not hallucinations." Id.

Moreover, Dr. Price testified that D.W. had "refused the recommended treatment that [Wishard] proposed for Bi Polar Disorder" because "[h]e doesn't think there's any need, or indication for it." Id. at 11. Similarly, Dr. Price testified that she does not "feel [D.W.] has a great deal of insight into his illness." Id. Dr. Price emphasized her recommendation that D.W.'s bipolar disorder be treated with certain psychotropic drugs, specifically Risperdal and Depakote. She stated that "it would be difficult to manage

4

[D.W.'s bipolar disorder] in other ways." Id. at 13. However, Dr. Price declined to predict whether she believed that D.W. would continue to act on his hallucinations if discharged without further treatment, saying, "I can't predict what would happen out of the hospital." Id. at 12.

Regarding D.W.'s ability to provide for his basic needs, Dr. Price testified that D.W. currently owns a house in Indianapolis, but "[a] prior house went through foreclosure when he couldn't pay his taxes." Id. at 9-10. She stated that it appeared that D.W. provided for himself in terms of his food and clothing, but she couldn't say how because he had been unemployed for the last three years. She stated that D.W. was not receiving any kind of disability.

When asked whether she believed that, as a result of his mental illness, D.W. was a danger to himself or others, Dr. Price testified that D.W. "was continuing to deny suicidal or homicidal ideation" and that she "[didn't] think his intentions are to endanger himself, or others." Id. at 9. However, Dr. Price then stated, "[a]lthough, without intentions he has potentially posed threat [sic] to others, he had a loaded weapon, and set the memorial on fire. So, without intentions he could have been danger to others." Id.

On cross-examination, Dr. Price was asked whether she found any of D.W.'s justifications for his behavior to be valid. She responded, "I believe that why he did what he did justifies his beliefs, and his actions. But, I don't believe other people have those same opinions. I don't believe other people have those same experiences, or would behave in a similar manor [sic]." Id. at 16.

5

D.W. testified on his own behalf. He confirmed owning his current home, and he stated that he supports himself by "selling off [his] things." Tr. p. 21. D.W. stated that he is a union electrician, but he has been unemployed for several years. He no longer receives unemployment, and he stated he is ineligible for other means of public assistance because he owns too many assets. When asked whether he has the support of his family, D.W. testified that his daughter "takes care of herself" and that his sister was present at the hearing. Id. Regarding Dr. Price's diagnosis, D.W. disagreed and stated his belief that he is "a very clear headed man." Id. at 22. He testified that he was opposed to taking any "mind altering drugs" because he was worried that they would affect his level-headedness and because of the side effects. Id. at 21-22. Later, D.W. stated he would be willing to try counseling, but he would resist taking any court-ordered medications "with all [his] might." Id. at 26.

D.W. also testified about his justifications for his actions at the War Memorial. He agreed that he was "increasingly frustrated with what's happening in this society" and that he felt compelled to make a statement. Tr. p. 26. He testified about his dissatisfaction with thirty-year loans and with "homosexual people teaching our kids." Id. at 29. D.W. stated his objections to the Iraq war and to how young adults are "ruined as a person" after they act on their training to kill during military combat. Id. at 30. D.W. was also unhappy about the police taking protesters' provisions and spraying protesters with pepper spray at the Occupy Indianapolis march, as well as about "manholes blowing up into people's cars" and bridges falling. Id. at 31–32, 37–38.

6

D.W. characterized his actions as "divine intervention" and stated he was "bringing a cross to Christ up to the top of the building" for the purpose of "bring[ing] God back into the world." Id. at 36. However, D.W. testified that he did not believe he would need to repeat his actions because it was a "one time deal" and because there is a video of it. Id. at 37.

After hearing all the evidence, the trial court found that there was clear and convincing evidence that D.W. was suffering from bipolar disorder, manic episode, which is a mental illness as defined by Indiana Code section 12-7-2-130, and that D.W. was gravely disabled as defined by Indiana Code section 12-7-2-96. On this basis, the court found that D.W. was in need of custody, care, and treatment at Wishard Health Services and ordered D.W. to be temporarily committed for a period not to exceed ninety days. D.W. now appeals.

DISCUSSION AND DECISION

D.W. appeals his temporary commitment to Wishard, challenging the sufficiency of the evidence. D.W. contends that the trial court erred in ordering his temporary commitment because failed to prove that he was either mentally ill or gravely disabled.

We initially observe that a trial court may order temporary involuntary commitment of an individual for a period of up to ninety days if a petitioner proves by clear and convincing evidence that the individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. Ind. Code § 12-26-6-1. Civil commitment is a significant deprivation of liberty that requires the petitioner to show "'that the individual suffers

7

from something more serious than is demonstrated by idiosyncratic behavior.'" In re Involuntary Commitment of A.M., 959 N.E.2d 832, 835 (Ind. Ct. App. 2011) (quoting Addington v. Texas, 441 U.S. 418, 427 (1979)).

When reviewing an order of commitment, we will consider only the evidence favorable to the judgment and all reasonable inferences. Heald v. Blank, 785 N.E.2d 605, 613 (Ind. Ct. App. 2003). We will not reweigh the evidence or judge the credibility of witnesses. Golub v. Giles, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. Id.

For the purpose of the temporary commitment statute, "mental illness" is defined as "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Ind. Code § 12-7-2-130. The evidence most favorable to the trial court's finding that D.W. is mentally ill shows that D.W. stipulated to Dr. Price's expertise as a physician, and Dr. Price unequivocally testified that D.W. suffers from bipolar disorder, manic episode, with psychotic features. Tr. p. 5, 7. Thus, the trial court, as the finder of fact, reasonably concluded that D.W. suffered from mental illness.

We next turn to D.W.'s contention that he is not gravely disabled. Indiana Code section 12-7-2-96 defines "gravely disabled" as:

a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, or other essential human needs; or (2) has a

8

substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

We first note that because this definition is written in the disjunctive, the trial court's finding that D.W. is gravely disabled survives if we find that there was sufficient evidence to prove either that D.W. is unable to provide for his basic needs or that his judgment, reasoning, or behavior is so impaired or deteriorated that it results in D.W.'s inability to function independently. See T.A. v. Wishard Health Serv., 950 N.E.2d 1266, 1271 n.2 (Ind. Ct. App. 2011).

D.W. focuses his challenge on the second prong of the definition of gravely disabled. More particularly, he asserts that Dr. Price failed to prove that D.W. is unable to function independently. Appellant's Br. p. 7. D.W. admits that he "exercised his First Amendment right to free speech in a most unusual way" but contends that his actions do not show that he is unable to function independently because they were merely "a creative and unusual way to get his views out to the public." Appellant's Br. p. 3, 8. However, to the extent that these arguments are meant to refute Dr. Price's testimony that D.W. is gravely disabled, this is a request to reweigh the evidence, which we may not do.

The evidence most favorable to the trial court's finding that D.W. is gravely disabled was Dr. Price's testimony that D.W. continues to justify the actions that led to his hospitalization, which included driving a Jeep up the steps of the Indiana War Memorial and setting a fire there while he was wrapped in an American flag and wearing gold-painted boots, all while carrying a cross and staff as well as a loaded weapon. Tr. p.

9

8-9, 28. Furthermore, Dr. Price testified that D.W. has poor insight into his mental illness and that he is resistant to the recommended treatment plan. Id. at 10-11. As noted above, D.W. testified that he would resist taking the recommended medications "with all [his] might." Id. at 26. This evidence is sufficient to show that D.W., as a result of mental illness, is in danger of coming to harm because he has a substantial impairment or an obvious deterioration of his judgment, reasoning, or behavior that results in his inability to function independently.

Notwithstanding the above, D.W. likens his situation to the circumstances found in K.F. v. St. Vincent Hosp. & Health Care Ctr., 909 N.E.2d 1063 (Ind. Ct. App. 2009), in which this court held that the evidence was insufficient to show that K.F. was unable to function independently when she had a supportive husband who agreed to secure outpatient treatment for her. 909 N.E.2d at 1067. D.W.'s circumstances are easily distinguishable. Although two of D.W.'s family members attended his temporary commitment hearing, neither testified, and D.W.'s only statements regarding their support at the hearing were that his daughter "takes care of herself" and that his sister was present at the hearing. Tr. p. 21.

This court has decided a number of other cases with circumstances that are more similar to D.W.'s situation than K.F. For example, in In re the Involuntary Commitment of A.M., 959 N.E.2d 832 (Ind. Ct. App. 2011), A.M. was diagnosed with bipolar disorder after a manic episode that resulted in her hospitalization, during which she exhibited many of the same symptoms as D.W., such as difficulty sleeping, impulsivity, agitation

10

and changed mood, and delusional thoughts. 959 N.E.2d at 834. In addition, similar to Dr. Price's testimony regarding D.W., A.M.'s treating physician testified that A.M. "did not believe she had bipolar disorder, and her insight into her condition was 'nil.'" Id. Moreover, like D.W., A.M. resisted taking the medications necessary to treat her bipolar disorder. Id. Based on this evidence, this court concluded that there was sufficient evidence that A.M. was gravely disabled under the second prong of the statutory definition.

Finally, we note that in T.A. v. Wishard Health Service, 950 N.E.2d 1266 (Ind. Ct. App. 2011), T.A. attempted to explain away her erratic behaviors by stating she removed her clothes in public as an objection to the police "following her and harassing her throughout the day." 950 N.E.2d at 1269-70. However, this court observed that T.A's choice to take her clothes off in public was not, as she claimed, "merely unwise or idiosyncratic." Id. at 1271-72. Rather, T.A.'s physician had testified that T.A.'s behaviors were consistent with the manic episodes found in bipolar disorder. Id. Likewise, Dr. Price testified that although D.W. may believe that the reasons for his actions are valid, she disputed that others would share similar opinions or behave similarly based on those opinions. Tr. p. 16.

In conclusion, our review of the evidence most favorable to the judgment demonstrates that the evidence presented at the evidentiary hearing was more than sufficient for a reasonable person to have concluded that D.W. is both mentally ill and gravely disabled. Thus, we decline to set aside the commitment order.

11

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.