## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 18 2017, 8:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

K.J.,
*Appellant,*

v.

State of Indiana,
*Appellee.*

January 18, 2017

Court of Appeals Case No.
18A02-1607-MH-1610

Appeal from the Delaware Circuit Court

The Honorable Linda Ralu Wolf, Judge
The Honorable Timothy Hollems, Master Commissioner

Trial Court Cause No.
18C03-1310-MH-201

**Bradford, Judge.**

# Case Summary

Appellant K.J. suffers from Schizo-Affective Disorder. As a result of her condition, K.J. was committed to the Division of Mental Health and Addiction of Richmond State Hospital ("RSH") in November of 2013. At some point, K.J.'s condition stabilized and her commitment was transferred to a less restrictive placement with Meridian Health Services ("MHS"). In July of 2016, a representative of MHS filed a petition seeking an expedited review of K.J.'s case and requesting a more restrictive placement. Following a hearing, the trial court issued an order continuing the regular commitment of K.J. and placed her at RSH.

On appeal, K.J. contends that the evidence is insufficient to support the trial court's order continuing her regular commitment. She also contends that the statutes setting forth the procedures relating to regular commitments are unconstitutional. Concluding otherwise, we affirm.

# Facts and Procedural History

On October 2, 2013, K.J. was seen by medical personnel in the emergency room at Ball Memorial Hospital ("BMH"). Merrill McKinley, a licensed medical social worker with MHS, filed an emergency detention petition and K.J. was subsequently admitted to BMH after the treating medical personnel determined that she was gravely disabled and in need of immediate restraint. At the time, K.J. appeared to be delusional and exhibited tangential thinking,

auditory hallucinations, and paranoid thoughts. K.J. was subsequently diagnosed with suffering from Schizo-Affective Disorder.

[4] Following a hearing on the emergency detention petition, the trial court found that K.J. (1) was suffering from Schizo-Affective disorder, (2) was gravely disabled, and (3) was in need of commitment to an appropriate mental health facility for a period that was expected to exceed ninety days. The trial court further found that the least restrictive environment suitable to provide K.J. with the necessary care was a mental health facility operated by Appellee the State of Indiana ("the State"). K.J. was subsequently admitted to RSH on or about November 27, 2013.

[5] On September 19, 2014, the Superintendent of RSH filed the statutorily-mandated annual periodic report on a regularly-committed individual. In this report, the Superintendent of RSH noted that K.J.'s condition had stabilized, she met all discharge criteria, and she was not a danger to herself or others. In light of K.J.'s improved condition, the Superintendent of RSH requested that K.J. be transferred to MHS. On September 24, 2014, the trial court entered an order continuing K.J.'s regular commitment without first conducting a hearing.[1] K.J. was then discharged from RSH and transferred to MHS.[2]

---

[1] K.J. does not challenge this order in the instant appeal.

[2] On September 27, 2014, K.J. was again admitted to BMH after presenting with auditory hallucinations, racing thoughts, extreme agitation, extreme confusion, and displaying suicidal

On September 2, 2015, an appropriate representative of MHS filed the statutorily-mandated annual periodic report on a regularly-committed individual. This report indicated that K.J. suffered from Schizo-Affective Disorder, Borderline Personality Disorder, and Polysubstance Dependence. The report further indicated that, while K.J. was not a danger to herself, she was gravely disabled. On September 3, 2015, the trial court entered an order continuing K.J.'s regular commitment without first conducting a hearing.[3]

On October 6, 2015, BMH filed an application for the emergency detention of a mentally-ill and dangerous person. The application indicated that K.J. heard voices that told her to overdose on pills, was emotionally unstable and distraught, had delusional thoughts, and felt overwhelmed and hopeless. The application also indicated that K.J. was suicidal and was suffering from hallucinations. K.J. was dismissed from the hospital on October 19, 2015.

On June 7, 2016, MHS filed a petition for expedited review of K.J.'s case. The petition also included a request for more restrictive placement. The petition indicated that K.J.'s condition had not improved and that she was currently in the inpatient unit at BMH. The petition further indicated that K.J. had previously been admitted to BMH's Psychiatry Unit from May 17-20, 2016 and

thoughts. Though the exact date is not clear from the record, she was subsequently discharged back to MHS.

[3] K.J. does not challenge this order in the instant appeal.

on May 31, 2016, "and now needs to be committed to a State operated facility." Appellant's App. Vol. II, p. 73.

[9] The trial court conducted a hearing on MHS's petition on June 10, 2016. During this hearing, Carol Miller, a Behavior Clinician at MHS who worked with K.J. on a regular basis, testified that K.J.'s condition had deteriorated such that she believed that a more restrictive placement was necessary. Also during this hearing, Dr. Rohit Borkhetaria, a staff psychiatrist with MHS who has treated K.J., testified that K.J. suffers from "Schizo-Affective Disorder, Unspecified Anxiety Disorder, Poly-Substance Abuse Disorder, by history, and Borderline Personality Disorder." Tr. p. 10. Dr. Borkhetaria testified that based on K.J.'s current condition, a more restrictive placement was necessary to effectively treat K.J. Dr. Borkhetaria testified that K.J. was a danger to herself and suffered from "a substantial impairment or obvious deterioration of her judgment, reasoning or behavior that results in her inability to function independently[.]" Tr. p. 12.

[10] Following the conclusion of the hearing, the trial court issued an order in which it found that K.J. continues to suffer from mental illness and is both dangerous to herself and gravely disabled. The trial court further found that RSH is the least restrictive environment suitable to provide her with the necessary care, treatment, and protection. The trial court ordered that K.J. should continue under a regular commitment and placed K.J. at the RSH. This appeal follows.

# Discussion and Decision

On appeal, K.J. challenges the trial court's commitment order by arguing that the evidence presented is insufficient to prove that a regular commitment is necessary. K.J. alternatively argues that Indiana Code chapter 12-26-15, which sets forth the procedures which are to be followed when completing the required annual review of a regular commitment, is unconstitutional.

# I. Sufficiency of the Evidence

## A. Standard of Review

When reviewing a challenge to the sufficiency of the evidence with respect to commitment proceedings, we will only look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *Golub v. Giles*, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004), *trans. denied*. In reviewing the evidence supporting the judgment, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. "Where the evidence is in conflict, we are bound to view only that evidence that is most favorable to the trial court's judgment." *Id*. If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible. *Id*.

*M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005).

In completing this review, we acknowledge that a civil commitment is a significant deprivation of liberty that requires due process protections. *Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Mental Health*, 23 N.E.3d 29, 33 (Ind. Ct. App. 2014) (internal quotation omitted), *trans. denied*. "Because everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than

is demonstrated by idiosyncratic behavior." *Id*. (internal quotation omitted). As such, the petitioner seeking a civil commitment is required to prove by clear and convincing evidence that the individual for whom the commitment is sought is (1) mentally ill and (2) either dangerous or gravely disabled and that (3) commitment is appropriate. *Id*. (citing Ind. Code § 12-26-2-5(e)).

[14] "In order to carry its burden of proof, the petitioner is not required to prove that the individual is both dangerous and gravely disabled." *Id*. (internal quotation omitted). "However, there is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *Id*. (internal quotation omitted).

## B. Analysis

[15] We initially note that K.J. does not challenge the trial court's determination that she suffers from mental illness pursuant to Indiana Code section 12-7-2-130, which defines mental illness as "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Instead, K.J. argues that the State failed to present sufficient evidence to support the trial court's determination that she is gravely disabled. The term "gravely disabled" is defined as follows:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment,

> reasoning, or behavior that results in the individual's inability to function independently.

Ind. Code § 12-7-2-96.

> As we have often noted, because this statute is written in the disjunctive, a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual is unable to provide for [her] basic needs or that [her] judgment, reasoning, or behavior is so impaired or deteriorated that it results in [her] inability to function independently.

*Civil Commitment of W.S.*, 23 N.E.3d at 34 (citing *T.A. v. Wishard Health Servs.*, 950 N.E.2d 1266, 1271 n. 2 (Ind. Ct. App. 2011); *A.L. v. Wishard Health Servs.*, 934 N.E.2d 755, 762 n. 2 (Ind. Ct. App. 2010), *trans. denied*).

Here, the evidence most favorable to the trial court's determination that K.J. is gravely disabled indicates that K.J. continues to suffer from a psychiatric disorder such that she is both (1) a danger to herself and (2) suffers from a substantial impairment which renders her unable to function independently. Miller, who, again, has worked with K.J. at MHS on a regular basis, testified during the June 16, 2016 hearing that K.J.'s condition had deteriorated such that she believed that a more restrictive placement was necessary. Specifically, Miller testified as follows:

> [K.J.] has been increasingly getting worse with her symptoms to the point that our staff is no longer able to manage her care. We have a deep fear of her being either suicidal, drug overdose, [or] homicidal. She has been very hostile toward her family to the point that they are afraid for their safety. She makes very

impulsive decisions that, you know, put her in harmful situations. She's not really taking her medication like she used, you know, like she should. Even though we go every day to watch her take her morning meds, she doesn't always take her evening meds. Like, we'll sit down, talk to her and make a plan of treatment. She is not very cooperative with her treatment. We have a hard time, you know, getting her to be compliant. Understanding, you know, the choices she makes impacts her life, you know, in a negative way. She's been hospitalized five (5) times in the last month. I mean as soon as she gets out of this inpatient, she's back in the ER. Usually she is either drug seeking or she's psychotic.

Tr. pp. 5-6. Miller further testified that she believed K.J. was a danger to herself, stating as follows:

She put herself in some risky situations that has really, you know, concerned the team.… she had got, she was released from inpatient a couple weeks ago, she went out and got alcohol, and got drunk. Her mom called us saying that, you know, she came there drunk and, I mean, it was like an ongoing situation from the time she got out of the hospital to the time, for the next four (4) days, trying to, you know, resolve that issue, work with her on, you know, using better decision, judgment, you know, using her coping skills, you know, understanding that, you know, drinking, drugging is not the way to go, especially when you have a mental illness, make sure she [is] taking her medication, you know, communicating with her family. She would go to her, her mom['s] house and get disruptive. Her mom had to call the police on her, and I had came [sic] that day to take her to see [the doctor], and I told her, I said, well, I said if the police come here let them know that she's at [MHS]. And she saw [the doctor], and then, the next thing I know she, she, um, a couple hours later, a few hours later, she went to the ER saying that she was psychotic, delusional and paranoid.

Tr. pp. 6-7. Miller also testified that she believed that K.J. suffered from a substantial impairment or an obvious deterioration in her judgment which rendered her unable to function.

[17] In addition, Dr. Borkhetaria, who, again, has treated K.J. at MHS, testified that K.J. suffers from "Schizo-Affective Disorder, Unspecified Anxiety Disorder, Poly-Substance Abuse Disorder, by history, and Borderline Personality Disorder." Tr. p. 10. Dr. Borkhetaria testified that based on K.J.'s current condition, a more restrictive placement was necessary to effectively treat K.J. Dr. Borkhetaria testified that K.J. was a danger to herself and suffered from "a substantial impairment or obvious deterioration of her judgment, reasoning or behavior that results in her inability to function independently[.]" Tr. p. 12.

[18] The foregoing evidence clearly and convincingly demonstrates that K.J. is in danger of coming to harm because she suffers from a substantial impairment of her judgment, reasoning, and behavior. The evidence further demonstrates that in light of this impairment, K.J. is unable to function independently. Based upon the evidence presented, the trial court's determination that K.J. is gravely disabled is reasonable. As such, we conclude that the trial court's order providing for the continuation of K.J.'s regular commitment is supported by clear and convincing evidence. K.J.'s contention to the contrary is merely an invitation for this court to reweigh the evidence, which we will not do. *See M.Z.*, 829 N.E.2d at 637.

# II. Constitutional Concerns

K.J. alternatively argues that Indiana Code chapter 12-26-15 is unconstitutional because it does not require an automatic hearing on the statutorily-mandated annual review of a regular commitment, but rather places the burden on the committed individual, or a representative of the committed individual, to request a hearing on said review.

## A. Indiana Code Chapter 12-26-15

With respect to an individual subject to a regular commitment, Indiana Code section 12-26-15-1 provides that "[a]t least annually, … the superintendent of the facility or the attending physician including the superintendent or attending physician of an outpatient therapy program, shall file with the court a review of the individual's care and treatment." This review "must contain a statement of the following: (1) [t]he mental condition of the individual[;] (2) [w]hether the individual is dangerous or gravely disabled[; and] (3) [w]hether the individual: (A) needs to remain in the facility; or (B) may be cared for under a guardianship."

"Upon receipt of the report required by section 1 of this chapter, the court *shall* do one (1) of the following: (1) [o]rder the individual's continued custody, care, and treatment in the appropriate facility or therapy program[;] (2) [t]erminate the commitment or release the individual from the therapy program[; or] (3) [c]onduct a hearing [.]" Ind. Code § 12-26-15-2(a) (emphasis added). "The

court may, in order to make provision for the individual's continued care, appoint a guardian for the individual." Ind. Code § 12-26-15-2(b).

[22] Upon receiving a copy of the court order, the individual or the individual's representative may request a hearing for review or dismissal of the commitment or order concerning the therapy program. The right to review of the regular commitment or therapy order is limited to one (1) review each year, unless the court determines that there is good cause for an additional review.

Ind. Code § 12-26-15-3(a). "When a hearing request is received, the court shall set a hearing date and provide at least five (5) days notice to all of the following: (1) [t]he individual[;] (2) [t]he individual's counsel[; and] (3) [o]ther interested parties." Ind. Code § 12-26-15-3(b). The hearing may be held "at a facility or other suitable place not likely to have a harmful effect on the individual's health or well-being." Ind. Code § 12-26-6-5.

## B. Analysis

[23] In arguing that Indiana Code chapter 12-26-15 violates a committed individual's right to due process, K.J. relies on our prior opinion in *In re Matter of Tedesco*, 421 N.E.2d 726 (Ind. Ct. App. 1981). This reliance is misplaced, however, because *Tedesco* can easily be distinguished from the instant matter.

[24] In *Tedesco*, Tedesco's father filed a petition for the involuntary regular commitment of Tedesco. 421 N.E.2d at 727. In this petition, Tedesco's father alleged that Tedesco talked to dead relatives, threatened to kill his father and brothers, and was suicidal. *Id*. Tedesco was detained in the Madison State

Hospital a for a period of fourteen days before the trial court conducted a probable cause hearing on his father's petition. *Id.* On appeal, we were faced with the question of whether the delay of fourteen days before conducting a hearing following Tedesco's initial detention violated his due process rights. *Id.* at 728-731. In finding that it did, we acknowledged that a trial court should conduct a hearing following an initial detention within a reasonable time and found fourteen days did not meet this standard. *Id.* at 730. However, we concluded that absent any indication that Tedesco's regular commitment hearing was tainted by his prehearing detention, dismissal of the proceedings was not warranted. *Id.* at 731. In reaching this conclusion, we noted that Tedesco had not challenged the regular commitment hearing as being procedurally defective or the sufficiency of the evidence which led the trial court to commit him for a period to exceed ninety days. *Id.*

[25] Unlike in *Tedesco*, in the instant matter, K.J. makes no challenge to the initial commitment hearing which was conducted in 2013. Instead, she challenges the procedures relating to the statutorily-mandated annual review of her case. Our conclusion in *Tedesco*, which, again, considered only the time limitations for conducting an initial hearing when committing an individual, therefore has no bearing on the question at issue in the instant appeal.

[26] Further, K.J. does not argue that she was denied a hearing after a request for a hearing was made or that the hearing conducted by the trial court was procedurally deficient. The record reveals that upon receiving K.J.'s request for a hearing, the trial court followed the relevant statutorily-mandated procedures

for providing notice of and conducting said hearing. During this hearing, K.J., through her attorney, was provided with the opportunity to cross-examine the State's witnesses and to present evidence on her behalf. This is all that is required by due process. *See Ind. State Bd. of Educ. v. Brownsburg Cmty. Sch. Corp.*, 842 N.E.2d 885, 889 (Ind. Ct. App. 2006) (providing that due process generally requires notice, an opportunity to be heard, and an opportunity to confront witnesses). K.J., therefore, failed to demonstrate that she was denied due process with regard to the challenged order of the trial court.

[27] Furthermore, even if we were to consider K.J.'s challenges to Indiana Code chapter 12-26-15 as a blanket challenge to Indiana Code chapter 12-26-15, rather than considering only the facts and circumstances of this case, we conclude that such a challenge would also fail. K.J. points to no authority, and we find none, suggesting that due process requires that a trial court conduct a hearing in all annual reviews of a committed individual's case. Again, "[g]enerally stated, due process requires notice, an opportunity to be heard, and an opportunity to confront witnesses." *Id.* (citing *In re M.L.K.*, 751 N.E.2d 293, 295-96 (Ind. Ct. App. 2001)). "The notice provided must be reasonably calculated, under all the circumstances, to afford the interested parties an opportunity to present their objections." *Id.* (citing *In re M.L.K.*, 751 N.E.2d at 296). "'Such notice must reasonably convey the required information to the affected party, must afford a reasonable time for that party to respond, and is constitutionally adequate when the practicalities and peculiarities of the case are reasonably met.'" *Id.* (quoting *In re M.L.K.*, 751 N.E.2d at 296).

[28]     As is set forth above, Indiana Code chapter 12-26-15 provides for notice of a trial court order to continue an individual's commitment to the committed individual as well as for an opportunity to be heard. Specifically, Indiana Code chapter 12-26-15 provides that upon receiving a copy of the court order, a committed individual, or the individual's representative, may request a hearing for review or dismissal of the commitment order. Ind. Code § 12-26-15-3. During this hearing, the committed individual, either individually or by counsel, is given the opportunity to be heard and to confront the petitioner's, *i.e.*, the State's, witnesses. This procedure satisfies the requirements of due process.[4] We therefore conclude that K.J.'s challenge to the constitutionality of Indiana Code chapter 12-26-15 is without merit.

[29]     The judgment of the trial court is affirmed.

Vaidik, C.J., and Brown, J., concur.

---

[4] Stated differently, although K.J. argues that a hearing should be conducted automatically rather than only upon request, due process requires only that an individual be given the opportunity to be heard, an opportunity which is provided for by Indiana Code chapter 12-26-15.